[No. D052237. Fourth Dist., Div. One. Jan. 9, 2009.]

RIVERWATCH et al., Plaintiffs and Appellants, v.
OLIVENHAIN MUNICIPAL WATER DISTRICT, Defendant and
Respondent;
GREGORY CANYON LTD., Real Party in Interest.

COUNSEL

Law Offices of Everett L. DeLano III, Everett L. DeLano III and M. Dare DeLano for Plaintiff and Appellant RiverWatch.

Procopio, Cory, Hargreaves & Savitch and Walter E. Rusinek for Plaintiff and Appellant Pala Band of Mission Indians.

Law Offices of Wesley W. Peltzer and Wesley W. Peltzer for Defendant and Respondent.

Allen Matkins Leck Gamble Mallory & Natsis, Patrick E. Breen and Heather S. Riley for Real Party in Interest.

OPINION

McDONALD, J.—RiverWatch and Pala Band of Mission Indians (together RiverWatch) appeal a judgment denying their petition for writ of mandate that challenged the validity of an agreement between the Olivenhain Municipal Water District (OMWD) and Gregory Canyon Ltd. (GCL) based on OMWD's alleged noncompliance with the California Environmental Quality Act (Public Resources Code, § 21000 et seq.)[1] (CEQA). On appeal,

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

RiverWatch contends (1) the trial court erred by concluding OMWD's approval of the agreement did not require its prior CEQA review of the environmental impacts of the agreement; (2) OMWD was a responsible agency under CEQA; and (3) the County of San Diego Department of Environmental Health (DEH) was not an indispensable party to this action.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 1994 the voters of San Diego County approved Proposition C, providing for the construction and operation of a landfill and recycling collection center at the Gregory Canyon site in northern San Diego County (Landfill). In February 2003 DEH, as the lead public agency, certified a final environmental impact report (2003 EIR) for the Landfill project and, in October 2004 approved the Landfill project. In July 2004 RiverWatch (joined by the City of Oceanside) filed a petition for writ of mandate challenging the adequacy of the 2003 EIR. On October 3, 2005, the trial court issued a minute order granting in part and denying in part that petition. The court stated: "[W]hile the EIR heavily relies on the pumping of groundwater [citations] for which admittedly there is yet no permit [citation], there is no meaningful discussion concerning alternative sources of water or back-up plans to obtain necessary water for the project should the permit not be issued or should water become unavailable . . . ."[2] The court noted that a 2004 update to the 2003 EIR discussed the trucking of water to the Landfill site in the event sufficient groundwater was unavailable.[3] The court concluded: "Since trucking water to the site would potentially cause adverse environmental impacts, this alternative should have been studied and included in a supplemental environmental document. [¶] Thus, [RiverWatch is] correct that the Final EIR was required to identify the source of water necessary to construct and operate the Landfill and to analyze the impacts of obtaining water. [Citation.]" The court stated:

[2] Water is needed for the construction and operation of the Landfill for dust control, compaction, and other purposes.

[3] The court stated: "[O]n June 2, 2004, the County issued an 'Environmental Review Update Checklist' which for the first time indicated that '[i]n the unlikely event that none of these sources of water are available to serve the project, water will be trucked to the site' [citation] and 'water trucking companies have verified their ability to serve the project if necessary. Other sources of water are available, as discussed in detail later.' [Citation.] The 2004 Update goes to great lengths to discuss sources of water and alternatives. [Citations.] Apparently in response to comments made after the close of public comment, Respondents deemed additional explanation was required. However, this information was never circulated to the public or agencies for comment and was never actually included in a supplemental or subsequent EIR. This document was never before the public or administrative agency for review. More importantly, the casual mention of trucking water to the site was never studied or previously proposed."

"[RiverWatch] correctly conclude[s] the Final EIR relies on a non-existent appropriative right and undocumented riparian rights to conclude that there is sufficient water for the Landfill. Since the EIR is defective as to water supply, it is necessarily defective as to baseline impacts. The Final EIR is consequently defective in these respects and the Court grants [RiverWatch's] writ [petition] as to water supply impacts.

"Insofar as [RiverWatch] argued Respondents should have recirculated the Final EIR and/or issued a supplemental or subsequent EIR based on the new information concerning water supply and specifically information concerning trucking water onto the site, the Court grants [RiverWatch's] writ [petition] in that regard as well. [Citation.]"

On January 20, 2006, the trial court entered its judgment granting RiverWatch's petition in part and issued a peremptory writ of mandate ordering DEH (and the Director of the County of San Diego Solid Waste Local Enforcement Agency) to set aside (1) the February 6, 2003, decision certifying the 2003 EIR for the Landfill project; (2) the June 2, 2004, decisionmaking findings in connection with its approval of the Landfill project under CEQA; and (3) the June 2, 2004, decisions approving the solid waste facility permit, statement of overriding considerations, and mitigation monitoring and reporting program for the Landfill project. The writ remanded those decisions to DEH for reconsideration.

On February 17, 2006, OMWD's board of directors approved an agreement for OMWD to provide GCL with up to 244,000 gallons of recycled water per day for use at the Landfill for a term of up to 60 years. At the meeting, GCL's counsel informed the board that about 89 truck trips per day would be required to pick up the recycled water at OMWD's reservoir and pump station near the 4S Ranch neighborhood and deliver it to the Landfill. The minutes of the board meeting show the directors did not address the 2003 EIR or any other environmental impacts of the agreement.[4] Effective as of March 15, OMWD and GCL, as owner of the Landfill, entered into the agreement (Agreement) pursuant to which OMWD agreed to sell to GCL up to 244,000 gallons of recycled water per day for a term of up to 60 years. The Agreement provided GCL was solely responsible for the use and transportation of the recycled water, which was to be supplied by OMWD to GCL at the point of delivery (i.e., OMWD's pump station). Section 7 of the Agreement provided: "7. Installation of Improvements[.] As a material term of this Agreement, [GCL] shall pay for all new capital facilities that will be necessary to fill [GCL's] trucks at the Delivery Site. These improvements

---

[4] The minutes show GCL's counsel informed OMWD's board that *GCL* had "looked at the traffic impact through the 4S Ranch community and found that there are no significant environmental impacts."

include at a minimum, but are not limited to, approximately 1,000 feet of 24' wide asphalt road way, water handling facilities including 6-inch meter necessary to fill the trucks, concrete loading pad, and other ancillary appurtenances as may be required by [OMWD] in its sole discretion. . . . These improvements are currently estimated to cost fifty thousand dollars ($50,000.00); however, in no case are the costs for the improvements limited to this amount. All improvements determined necessary by [OMWD] must be completed prior to commencing deliveries, and no hauling will be allowed until all necessary regulatory permits (if any) are acquired by [GCL]. . . ." Section 8 of the Agreement provided: "8. Completion of CEQA Review and Other Permits[.] [GCL] shall be solely responsible for complying with all [CEQA] and National Environmental Protection Act requirements necessary for [GCL]'s receipt, use and transportation of the recycled water under this Agreement. [GCL] shall also be solely responsible for any and all permits required under any state, federal or local law for its receipt, use and transportation of recycled water under this Agreement."

On July 10, 2006, DEH, as lead agency for the Landfill project, issued a notice of availability of its revised partial draft environmental impact report (Revised Draft EIR) for the GCL Landfill project and a related public meeting. The notice stated the Revised Draft EIR was prepared to comply with the trial court's January 20, 2006, order and revised limited portions of the 2003 EIR, noting: "The Public Services and Facilities section has been revised to analyze impacts of the proposed use of off-site recycled water from [OMWD], including impacts from improvements at the OMWD Santa Fe Valley Reservoir and Pump Station. This water would be trucked from the OMWD Santa Fe Valley Reservoir and Pump Station located near the intersection of Artesian Road and Maranatha Way in Rancho Bernardo." The Revised Draft EIR consisted of almost 200 pages.

On August 9, 2006, RiverWatch filed the instant petition for writ of mandate challenging OMWD's approval of the Agreement. On March 6, 2007, RiverWatch filed the operative first amended petition for writ of mandate. The petition alleged in part:

"13. OMWD had discretionary decision-making authority with regard to the provision of treated wastewater to GCL, yet OMWD did not consider the environmental effects of the Agreement as shown in a validly adopted environmental impact report or negative declaration by another agency. OMWD also failed to consider feasible mitigation measures and alternatives within its power. . . . At the time the Agreement was being considered by OMWD, the County of San Diego was considering revisions to an environmental impact report concerning the proposed [Landfill] project, yet OMWD did not wait until the completion and certification of this report before considering the Agreement.

"14. OMWD did not conduct any environmental review prior to the [OMWD] Board's action approving the Agreement on February 17, 2006, or prior to executing the Agreement on March 15, 2006. OMWD has not stated that its actions in approving and executing the Agreement were exempt from CEQA, and it has not filed a notice of exemption under Public Resources Code section 21152. OMWD has not issued a notice of determination under Public Resources Code section 21152.

"15. By failing to provide notice under CEQA or to conduct any environmental review as required by CEQA, [OMWD] made it impossible for persons to comment on the Agreement and the potential environmental impacts of entering [into] the Agreement. . . .

"16. [RiverWatch] hereby seek[s] the issuance of a writ of mandate and/or injunctive or declaratory relief to require [OMWD] to terminate the Agreement and to not approve or execute any agreement for a similar purpose unless and until it completes a legally adequate review under CEQA, with notice of the proposed actions provided to residents in the area who will be directly impacted by the activities." The relief sought by RiverWatch included (1) a writ of mandate "directing [OMWD] to withdraw its approval of and to terminate the Agreement with GCL and to not approve any such agreement to provide treated wastewater to GCL unless and until such time as [OMWD] complies with the requirements of CEQA"; (2) "a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting [OMWD] and/or GCL from taking any further action to perform under the Agreement, including any action that would facilitate, approve, or allow development of the Delivery Point, until such time as [OMWD] complies with CEQA, and receives all necessary approvals"; and (3) "a declaration that [OMWD's] action in approving the Agreement violated CEQA."

On June 12, 2007, the trial court overruled OMWD's and GCL's demurrers to the first amended petition. After considering the parties' briefs and other papers and hearing counsel's arguments on the merits of the petition, the trial court issued its statement of decision denying the petition. The court concluded: "In the Court's view, [OMWD's] execution of the [Agreement] did not constitute the 'approval' of a project for CEQA purposes, such that prior environmental review was required." Citing section 8 of the Agreement and the parties' two subsequent letters clarifying that provision, the trial court concluded: "[P]erformance under the Agreement is conditioned upon the completion of adequate environmental/CEQA review. . . . Because performance under the Agreement here is conditioned on CEQA compliance, the Agreement does not constitute an 'approval' subject to CEQA review." Because the trial court denied the petition on the ground that OMWD's approval and execution of the Agreement did not constitute "approval" of a

project under CEQA, it did not consider the parties' other arguments regarding whether OMWD was a lead or responsible agency, whether the Agreement constitutes a "project" under CEQA, and whether RiverWatch was required to name DEH as party to the action.

On November 28, 2007, the trial court entered judgment for OMWD and GCL, denying the petition. RiverWatch timely filed a notice of appeal.

## DISCUSSION

## I

### *Standard of Review*

The abuse of discretion standard of review applies to our review of OMWD's compliance with CEQA in the circumstances of this case. Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues on which we granted review by independently determining whether the administrative record demonstrates any legal error by the [public agency] and whether it contains substantial evidence to support the [public agency's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].) Because OMWD did not make any determinations of disputed facts in this case, we review de novo, or independently, the question whether it complied with CEQA (i.e., "proceeded in a manner required by law") in approving and executing the Agreement. (§ 21168.5.) When a public agency fails to comply with procedures required by law, its decision must be set aside as presumptively prejudicial. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236 [32 Cal.Rptr.2d 19, 876 P.2d 505].) Noncompliance by a public agency with CEQA's substantive requirements "constitute[s] a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).)

## II

### *CEQA Generally*

■ In general, "CEQA compels government first to identify the environmental effects of projects, and then to mitigate those adverse effects through the imposition of feasible mitigation measures or through the selection of feasible alternatives. It permits government agencies to approve projects that have an environmentally deleterious effect, but also requires them to justify those choices in light of specific social or economic conditions. (§ 21002.)" (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at p. 1233.)

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.] 'Project' means, among other things, '[a]ctivities directly undertaken by any public [agency] [or an activity undertaken by a person which is supported, in whole or in part, through contracts or other forms of assistance from one or more public agencies].' [Citation.] . . . The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 [253 Cal.Rptr. 426, 764 P.2d 278], fns. omitted (*Laurel Heights*).)

■ "Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citations.] The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citations.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. omitted.) "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

"[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA." (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) In *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438 [263 Cal.Rptr. 340], we stated that "only through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . ." (*Id.* at p. 1454.) If a final environmental impact report (EIR) does not "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project," informed decisionmaking cannot occur under CEQA and the final EIR is inadequate as a matter of law. (*City of Santee*, at pp. 1454–1455.)

Although a lead agency is responsible for considering the effects of all activities involved in a project and, if required by CEQA, preparing the draft and final EIR's and certifying the final EIR for a project, a "responsible agency typically has permitting authority or approval power over some aspect of the overall project for which a lead agency is conducting CEQA review. [Citations.] . . . [¶] Responsible agencies have limited ability to conduct their own environmental review outside the processes initiated and managed by the lead agency. [Citations.] The responsible agency relies on the lead agency's environmental document in acting on whatever aspect of the project requires its approval. The responsible agency must, however, issue its own findings regarding the feasibility of relevant mitigation measures or project alternatives that can substantially lessen or avoid significant environmental effects. Furthermore, where necessary, a responsible agency must issue its own statement of overriding considerations. [Citations.]" (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (11th ed. 2007) ch. III.B.2, p. 53, fn. omitted.)

Alternatively stated, "[r]esponsible agencies are agencies, other than the lead agency, that have some discretionary authority for carrying out or approving a project. [Citation.] Responsible agencies generally rely on the information in the CEQA document prepared by the lead agency [e.g., an EIR] and ordinarily are not allowed to prepare a separate EIR or negative declaration. [Citations.] Further, while the lead agency is responsible for considering all environmental impacts of the project before approving it, a responsible agency has a more specific charge: to consider only those aspects of a project that are subject to the responsible agency's jurisdiction. [Citations.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2008) § 3.18, p. 122.) More importantly to this case,

"[b]efore reaching a decision on the project, the decision-making body of the responsible agency must consider the environmental effects of the project as shown in the EIR or negative declaration and feasible mitigation measures or alternatives within the agency's powers. [Citation.] If the responsible agency finds that any alternatives or mitigation measures within its powers are feasible and would substantially lessen or avoid a significant effect of the project, the responsible agency may not approve the project as proposed, but must adopt the feasible mitigation measures or alternatives. [Citation.] Each responsible agency must certify that its decision-making body reviewed and considered the information in the EIR or negative declaration on the project. [Citation.]" (1 Kostka & Zischke, *supra*, § 3.22, p. 126.) ▮ Furthermore, "[a] responsible agency must adopt findings when it approves a project for which an EIR was prepared. [Citation.] . . . [B]ecause a responsible agency considers only the parts of the project that are subject to its jurisdiction [citation], . . . [its findings are required] only for those effects within the scope of the responsible agency's jurisdiction." (1 Kostka & Zischke, *supra*, § 3.23, p. 126.)

## III

### *The Agreement's Activities as Part of the Landfill "Project" under CEQA*

To determine whether OMWD's approval of the Agreement without consideration of an EIR prepared by DEH violated CEQA, we first determine whether the activities approved by or to be carried out by OMWD under the Agreement were part of the Landfill "project" within the meaning of CEQA.

### A

A "project" subject to CEQA is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) *An activity directly undertaken by any public agency.* [¶] (b) *An activity undertaken by a person which is supported, in whole or in part, through contracts*, grants, subsidies, loans, or other forms of assistance *from one or more public agencies.* [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065, italics added.) For example, "projects" or activities directly undertaken by a public agency include public works construction and related activities, clearing and grading of land, and improvements to existing public structures. (Cal. Code Regs., tit. 14, § 15378, subd. (a)(1).) For purposes of CEQA, "environment" is defined as "the physical conditions which exist within the area which will be

affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance." (§ 21060.5.) CEQA applies only to "discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).)

█ " 'Project' is given a broad interpretation . . . to maximize protection of the environment." (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439], disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) "Project" refers to *"the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a), italics added.) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).) "Whether a particular activity constitutes a project in the first instance is a question of law." (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984 [28 Cal.Rptr.2d 305].)

B

Based on the undisputed facts in the record, we conclude the activities set forth in the Agreement constitute part of the Landfill "project" for purposes of CEQA. Because the 2003 EIR did not include an adequate analysis of water supply issues regarding the Landfill project, the trial court issued its January 20, 2006, judgment partially granting RiverWatch's 2004 petition and issued a writ ordering DEH and GCL to revise that part of the 2003 EIR to correct the deficiencies regarding traffic, water supply, and mitigation. The trial court's October 3, 2005, statement of decision that partially granted the 2004 petition stated in part: "[W]hile the EIR heavily relies on the pumping of groundwater [citations] for which admittedly there is yet no permit [citation], there is no meaningful discussion concerning alternative sources of water or back-up plans to obtain necessary water for the project should the permit not be issued or should water become unavailable . . . ." It noted that a 2004 update to the 2003 EIR discussed the trucking of water to the Landfill site in the event sufficient groundwater was unavailable. The court concluded: "Since trucking water to the site would potentially cause adverse environmental impacts, this alternative should have been studied and included in a supplemental environmental document. [¶] Thus, [RiverWatch is] correct that the Final EIR was required to identify the source of water necessary to construct and operate the Landfill and to analyze the impacts of obtaining water. [Citation.]"

In an effort to confirm the availability of sufficient water for the Landfill's construction and operations as required for a revised partial EIR for the Landfill project, GCL presumably then entered into negotiations, and, as of March 15, 2006, entered into the Agreement with OMWD for a contractual right to a 60-year supply of recycled water that could be trucked to the Landfill site. Subsequently, on July 10, 2006, DEH issued a notice of availability of the Revised Draft EIR, noting the public services and facilities section of the original 2003 EIR "has been revised to analyze impacts of the proposed use of off-site recycled water from [OMWD], including impacts from improvements at the OMWD Santa Fe Valley Reservoir and Pump Station. This water would be trucked from the OMWD Santa Fe Valley Reservoir and Pump Station located near the intersection of Artesian Road and Maranatha Way in Rancho Bernardo." Furthermore, the July 2006 Revised Draft EIR described the Landfill project as "includ[ing] the use of recycled water that will be trucked to the project site from [OMWD's] Santa Fe Valley Reservoir and Pump Station site near the intersection of Artesian Road and Maranatha Way West of I-15. In order to provide adequate water truck access to [OMWD's] site, approximately 1,000 feet of 24 foot wide asphalt roadway will be constructed around [OMWD's] blending reservoir. A concrete loading pad will be installed on the site with water handling facilities that include a 6 inch meter to fill the trucks." The Revised Draft EIR also states: "The primary source of water for the project will be recycled water purchased from [OMWD]."

██ Based on the undisputed facts in the administrative record, we conclude, as confirmed by the subsequent July 2006 Revised Draft EIR for the Landfill project, the activity of trucking recycled water from OMWD to the Landfill site is *part of the whole action* or operations of the Landfill project for purposes of CEQA. That activity includes the construction on the OMWD site of 1,000 feet of a 24-foot-wide asphalt roadway, a concrete loading pad, and a six-inch meter. On completion of that construction, as both the Agreement and the Revised Draft EIR reflect, the Landfill's operations will include the trucking of water from OMWD to the Landfill site, requiring as many as 89 water truck trips to deliver as much as 244,000 gallons of recycled water per day. GCL's performance of the required construction and operation of the water delivery trucks are activities undertaken by GCL "supported, in whole or in part," through a contract (i.e., the Agreement) with OMWD, a public agency. (§ 21065, subd. (b).) Furthermore, it cannot reasonably be disputed those activities "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (§ 21065.) The short-term activity of construction of the 1,000-foot asphalt road and concrete loading pad at the OMWD site presumably will cause noise, traffic, air pollution, and possibly other physical changes in the environment. (§ 21060.5; cf. Cal. Code Regs.,

tit. 14, § 15378, subd. (a)(1) [project includes activities of grading of land and improvements to existing public structures].) More importantly, GCL's long-term operational activity of using trucks to transport from OMWD to the Landfill site up to 244,000 gallons of recycled water per day for a period of up to 60 years presumably will cause long-term physical changes in the environment. The noise, traffic, and air pollution caused by up to 89 daily trips by water trucks over a period of 60 years cannot be deemed to cause no change in the environment. (§ 21065.)

Furthermore, OMWD's contractual commitment pursuant to the Agreement to deliver to GCL up to 244,000 gallons of recycled water per day for a period of 60 years also raises questions regarding the potential adverse impact on OMWD's current and future customers and OMWD's ability to meet the Agreement's required supply amount in the event of future droughts or water shortages that may occur over the course of the Agreement's lengthy 60-year period. Accordingly, we conclude the activities to be undertaken by GCL through the Agreement with OMWD constitute part of the Landfill project, which is subject to CEQA. (§ 21065; cf. *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 731–734 [32 Cal.Rptr.2d 704] [housing development project for purposes of CEQA included required expansion of offsite wastewater treatment plant and extension of existing sewer lines to development site]; *Santiago County Water Dist. v. County of Orange, supra,* 118 Cal.App.3d at pp. 829–830 [construction of additional water lines and supply of water to proposed mining operation were part of project for CEQA purposes].)

IV

*OMWD as a "Responsible Agency" Under CEQA*

RiverWatch contends that because OMWD proposed to carry out or approved part of the Landfill project (i.e., activities pursuant to the Agreement), OMWD is a "responsible agency" under CEQA.

A "responsible agency" under CEQA is any public agency that "proposes to carry out or approve a project, for which a lead agency is preparing or has prepared an EIR or negative declaration" and for which it has discretionary approval over all or part of that project. (Cal. Code Regs., tit. 14, § 15381; see also § 21069.) If an agency's approval is required for any activity "integral to the project" and the agency could, in its discretion, deny approval, then that agency is a responsible agency under CEQA. (*Lexington Hills Assn. v. State of California* (1988) 200 Cal.App.3d 415, 431 [246 Cal.Rptr. 97].) Although "the lead agency is responsible for considering all environmental impacts of the project before approving it, a responsible

agency has a more specific charge: to consider only those aspects of a project that are subject to the responsible agency's jurisdiction. [Citations.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 3.18, p. 122.)

Based on the undisputed facts in the administrative record, we conclude OMWD is a "responsible agency" under CEQA because it proposes to carry out and it approved part of the Landfill project (i.e., those activities described in the Agreement). Both the construction and water delivery activities provided in the Agreement constituted part of the Landfill project for CEQA purposes. On February 17, 2006, OMWD's board of directors approved the Agreement and OMWD subsequently signed the Agreement (as of Mar. 15, 2006) pursuant to that approval. By approving the Agreement and the activities described in it, OMWD exercised its discretionary authority as a public agency to *approve* part of the Landfill project.[5] (Cal. Code Regs., tit. 14, § 15381.) Furthermore, because the Agreement requires OMWD to deliver to GCL up to 244,000 gallons of recycled water per day for a period of 60 years, OMWD's direct activities constitute, in effect, its *carrying out* part of the Landfill project. (Cal. Code Regs., tit. 14, § 15381.) It cannot reasonably be argued that OMWD is not a responsible agency under CEQA with respect to the Landfill project.

 A "responsible agency" is *not* limited to those public agencies that approve, or issue a permit for, an *entire* project (e.g., the entire Landfill project), but also includes those agencies that carry out or approve *part* of a proposed project subject to CEQA. Furthermore, the fact there are regulatory or other administrative agencies with oversight over recycled water or its use does not preclude OMWD from being a responsible agency. (See, e.g., Water Code, §§ 13522.5, 13523, 13524.) We are unpersuaded by GCL's unsupported argument that a public agency cannot be a responsible agency if it merely approves or enters into a contract necessary to carry out part of a project.

V

*Was OMWD's Approval of the Agreement an "Approval" of*
*a Project under CEQA*

RiverWatch contends the trial court erred by concluding OMWD's approval of the Agreement did not constitute an "approval" of part of the Landfill project under CEQA.

---

[5] The parties do not dispute that OMWD is a public agency for purposes of CEQA.

## ▪ A

▪ Before approving or carrying out part of a project under CEQA, a responsible agency must consider a final EIR (or negative declaration) prepared and certified by the lead agency and "must . . . issue its own findings regarding the feasibility of relevant mitigation measures or project alternatives that can substantially lessen or avoid significant environmental effects. Furthermore, where necessary, a responsible agency must issue its own statement of overriding considerations. [Citations.]" (Remy et al., Guide to CEQA, *supra*, ch. III.B.2, p. 53; see also § 21081.) "Before reaching a decision on the project, the decision-making body of the responsible agency must consider the environmental effects of the project as shown in the EIR or negative declaration and feasible mitigation measures or alternatives within the agency's powers. [Citation.] If the responsible agency finds that any alternatives or mitigation measures within its powers are feasible and would substantially lessen or avoid a significant effect of the project, the responsible agency may not approve the project as proposed, but must adopt the feasible mitigation measures or alternatives. [Citation.] Each responsible agency must certify that its decision-making body reviewed and considered the information in the EIR or negative declaration on the project. [Citation.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 3.22, p. 126.) ▪ Therefore, as with a lead agency (e.g., DEH), "[b]efore approving the project, the [responsible] agency [e.g., OMWD] must . . . find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Laurel Heights, supra*, 47 Cal.3d at p. 391.)

▪ A lead or responsible agency's "ultimate decision of whether to approve [all or part of] a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA." (*Santiago County Water Dist. v. County of Orange, supra*, 118 Cal.App.3d at p. 829.) EIR's " 'must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.' [Citation.]" (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 77, fn. 5 [118 Cal.Rptr. 34, 529 P.2d 66].) "If postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken." (*Laurel Heights, supra*, 47 Cal.3d at p. 394.) Accordingly, if a responsible agency approves all or part of a project without first considering an EIR that has been or is being prepared by the lead agency and without making required findings, the responsible agency has not complied with CEQA and its approval must be set aside.

B

In this case, OMWD and GCL argued, and the trial court concluded, that because OMWD's performance under the Agreement was subject to certain conditions and imposed on *GCL* the sole responsibility for complying with CEQA, OMWD's approval and execution of the Agreement did not constitute approval of all or part of a project under CEQA.

CEQA regulations (often referred to as guidelines) define "approval" as follows:

"(a) 'Approval' means the *decision by a public agency which commits the agency to a definite course of action in regard to a project* intended to be carried out by any person. . . . Legislative action in regard to a project often constitutes approval.

"(b) *With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract*, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Cal. Code Regs., tit. 14, § 15352, italics added.)

██ Interpreting that definition of "approval," the California Supreme Court recently addressed the question of "when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 130–131 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).) *Save Tara* addressed the question of whether a CEQA compliance condition necessarily eliminates the need to prepare and consider an EIR before approving a development agreement: ██ "A CEQA compliance condition can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but *if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review.*" (*Save Tara*, at p. 132, italics added.) Discussing the circumstances in two cases that concluded CEQA conditions precluded agency approval under CEQA and without questioning the correctness of their dispositions, *Save Tara* stated that "each case involved particular circumstances limiting the reach of its logic; neither convinces us a broad rule exists permitting EIR preparation to be postponed in all circumstances by use of a CEQA compliance condition." (*Save Tara*, at p. 133.) In

*Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772 [1 Cal.Rptr.2d 107] (*Stand Tall*), a school district board authorized the district administration to purchase real property for a new school site, specifying that any offer to purchase was to be made contingent on completion of the EIR process and final state approval. (*Id.* at p. 777.) *Stand Tall* concluded "the Board's resolutions regarding the site selection do not constitute an 'approval' under CEQA because they do not commit the District to a *definite course* of action since they are expressly made contingent on CEQA compliance." (*Id.* at p. 781.) However, *Save Tara* limited *Stand Tall* to its facts because it involved a specific exception for land acquisition agreements: "[T]he [CEQA regulations] exception provides that 'agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(A).)" (*Save Tara, supra,* at p. 134.) *Save Tara* explained: "The [CEQA] Guidelines' exception for land purchases is a reasonable interpretation of CEQA, but it should not swallow the general rule (reflected in the same regulation) that a development decision having potentially significant environmental effects must be *preceded,* not *followed,* by CEQA review. (See [*Laurel Heights*], *supra,* 47 Cal.3d at p. 394 ['A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved.'].)" (*Ibid.*)

*Save Tara* likewise limited the second case, *Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181 [54 Cal.Rptr.3d 1] (*McCloud*), to its particular circumstances. (*Save Tara, supra,* 45 Cal.4th at p. 133.) In *McCloud,* a district executed an agreement giving a commercial water bottler exclusive rights to bottle and sell water from the district's sources, but the agreement was contingent on *the district* and the bottler completing during the contingency period proceedings under CEQA without any challenges thereto. (*McCloud, supra,* 147 Cal.App.4th 181.) *McCloud* concluded the district had not approved the project because of its contingencies, reasoning: "The biggest 'if' in the agreement however is *if* all discretionary permits, expressly defined as including CEQA documentation, review and approvals, along with the final adjudication of any legal challenges based on CEQA, are secured and all environmental, title, physical, water quality and economic aspects of the project are assessed." (*Id.* at p. 193, fn. omitted.) *Save Tara* noted: "[*McCloud*] relied in part on the agreement's lack of information as to the springs that would be exploited, the site of the bottling plant, how the water would be transported, and other details essential to environmental analysis of the project. Without that information, [*McCloud*] concluded, 'preparation of an EIR would be premature. Any analysis of potential environmental impacts would be wholly speculative

and essentially meaningless.' (*McCloud, supra*, 147 Cal.App.4th at p. 197.) In the terms used by the CEQA Guidelines to define 'approval'—'the decision by a public agency which commits the agency to a definite course of action' (Cal. Code Regs., tit. 14, § 15352, subd. (a))—*McCloud* thus speaks as much as to *definiteness* as to commitment and does not establish that a conditional agreement for development never constitutes approval of the development." (*Save Tara*, at p. 133.)

■ *Save Tara* rejected the argument that an agency's execution of a development agreement could never constitute approval of a project if that agreement provided that the agency retained future discretion to make final CEQA decisions. (*Save Tara, supra*, 45 Cal.4th at p. 134.) The court stated: "Such a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's '*earliest* commitment' to the project. (Cal. Code Regs., tit. 14, § 15352, subd. (b), italics added.) Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval (Pub. Resources Code, §§ 21100, 21151), so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made." (*Save Tara*, at p. 134.) *Save Tara* explained: ■ "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. . . . [¶] For similar reasons, *we have emphasized the practical over the formal in deciding whether CEQA review can be postponed, insisting it be done early enough to serve, realistically, as a meaningful contribution to public decisions*." (*Id.* at p. 135, italics added.) Accordingly, "postponing EIR preparation [and consideration thereof] until after a binding agreement for development has been reached would tend to undermine CEQA's goal of transparency in environmental decisionmaking. . . . When an agency reaches a binding, detailed agreement with a private developer and publicly commits resources and governmental prestige to that project, the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences." (*Id.* at p. 136.)

■ "On the other hand, we cannot agree with the suggestion . . . that any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' [Citation.]" (*Save Tara, supra*, 45 Cal.4th at p. 136.) "Approval, within the meaning of sections 21100 and 21151, cannot

be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined."[6] (*Save Tara, supra,* 45 Cal.4th at p. 136.)

 *Save Tara* adopted the following general approach: "[C]ourts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs., tit. 14, § 15126.6, subd. (e).) In this analysis, the contract's conditioning of final approval on CEQA compliance is relevant but not determinative." (*Save Tara, supra,* 45 Cal.4th at p. 139.) In support, *Save Tara* quoted from an authoritative CEQA treatise: " 'First, the analysis should consider whether, in taking the challenged action, the agency indicated that it would perform environmental review before it makes any further commitment to the project, and if so, whether the agency has nevertheless effectively circumscribed or limited its discretion with respect to that environmental review. Second, the analysis should consider the extent to which the record shows that the agency or its staff have committed significant resources to shaping the project. If, as a practical matter, the agency has foreclosed any meaningful option to going forward with the project, then for purposes of CEQA the agency has "approved" the project.' ([Remy et al., Guide to the Cal. Environmental Quality Act (CEQA), *supra,*] p. 71.) As this passage suggests, we look both to the agreement itself and to the surrounding circumstances, as shown in the record of the decision, to determine whether an agency's authorization or execution of an agreement for development constitutes a 'decision . . . which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352.)" (*Save Tara, supra,* 45 Cal.4th at p. 139.)

Applying that general approach to the circumstances in *Save Tara,* the court concluded that the "[c]ircumstances surrounding City's approval of the [draft and final development] agreements confirm City's commitment to the . . . project." (*Save Tara, supra,* 45 Cal.4th at p. 141.) Despite the final agreement's inclusion of a condition granting the city complete discretion over CEQA matters, the city's "public announcements . . . , its actions . . . preparing to relocate tenants from the property, its substantial financial contribution to the project, and its willingness to bind itself, by the . . . draft agreement, to convey the property if the developer 'satisfied' CEQA's

---

[6] *Save Tara* explained that certain "preliminary or tentative agreements may be needed in order for the project proponent to gather financial resources for environmental and technical studies, to seek needed grants or permits from other governmental agencies, or to test interest among prospective commercial tenants." (*Save Tara, supra,* 45 Cal.4th at p. 137.)

'requirements, as reasonably determined by the City Manager,' all demonstrate that City committed itself to a definite course of action regarding the project before fully evaluating its environmental effects. That is what sections 21100 and 21151 prohibit." (*Save Tara*, at p. 142.) Accordingly, the court returned the matter to the superior court: (1) to order the city to set aside its prior approval of the project; (2) if the city decides no subsequent or supplemental EIR is required, to review that decision; and (3) to make any other order necessary and proper under section 21168.9. (*Save Tara*, at p. 143.)

C

Based on our independent review of the Agreement and the undisputed circumstances surrounding OMWD's approval and execution of the Agreement, we conclude OMWD's approval and signing of the Agreement constituted approval of part of the Landfill project within the meaning of CEQA and its guidelines, as interpreted by *Save Tara*.[7] Under CEQA, "approval" is a "decision by a public agency which *commits the agency to a definite course of action* in regard to a project intended to be carried out by any person." (Cal. Code Regs., tit. 14, § 15352, subd. (a), italics added.) Furthermore, "[w]ith private projects, approval *occurs upon the earliest commitment to* issue or the issuance by the public agency of *a discretionary contract* . . . ." (Cal. Code Regs., tit. 14, § 15352, subd. (b).) Because the Agreement set forth the specific details regarding OMWD's 60-year obligation to deliver recycled water to GCL, and the construction required to allow that delivery, OMWD's approval and signing of the Agreement satisfied the definiteness requirement (i.e., a *definite* course of action). Furthermore, when on February 17, 2006, OMWD's board approved the Agreement and OMWD's execution of the Agreement, OMWD clearly *committed* itself to the course of action set forth in the Agreement, which is a discretionary contract. Therefore, by February 17, 2006, OMWD made its earliest commitment to a definite course of action regarding its part of the Landfill project (i.e., to deliver up to 244,000 gallons of recycled water to GCL per day for a period of 60 years for use at the Landfill project site).

Although the Agreement contained a provision regarding CEQA responsibility, that provision did not, in any reasonable construction, provide that *OMWD* retained its complete discretion under CEQA (as a responsible agency) to consider a final EIR certified by DEH and thereafter approve or disapprove its part of the Landfill project pursuant to the Agreement or to require mitigation measures or alternatives to its part of the project. Section 8

[7] We requested, and have received and considered, supplemental briefs by the parties regarding the effect on this appeal of the Supreme Court's recent decision in *Save Tara, supra*, 45 Cal.4th 116.

of the Agreement provided: "8. <u>Completion of CEQA Review and Other Permits</u>[.] [GCL] shall be solely responsible for complying with all [CEQA] and National Environmental Protection Act requirements necessary for [GCL]'s receipt, use and transportation of the recycled water under this Agreement. [GCL] shall also be solely responsible for any and all permits required under any state, federal or local law for its receipt, use and transportation of recycled water under this Agreement." That section provides it is *GCL's* sole responsibility for complying with CEQA regarding GCL's receipt, use, and transportation of the recycled water it purchases from OMWD pursuant to the Agreement. It does *not* provide that *OMWD* is responsible for complying with CEQA (as a responsible agency) *or* even that OMWD's performance of the Agreement is subject to OMWD's broad discretion to approve or disapprove the Agreement or to require mitigation measures or alternatives to the water delivery and construction activities set forth in the Agreement after OMWD has considered a final EIR certified by DEH regarding the Landfill project. Although the trial court, in interpreting section 8 of the Agreement, considered two letters between OMWD and GCL sent after execution of the Agreement, neither letter supports a reasonable inference that section 8 of the Agreement conditioned OMWD's performance on its subsequent exercise of its CEQA responsibilities and discretion after considering a final EIR certified by DEH.

On April 21, 2006, OMWD sent GCL a letter stating: "The purpose of this letter is to reiterate per the terms of § 8 of the [Agreement] that [OMWD] will not deliver recycled water to [GCL] *until such time [GCL] has completed a legally adequate [CEQA] process* which addresses the impacts of the use of recycled water on the project, San Diego County has adopted the [EIR] for the project and all other necessary permits for the project are in place." (Italics added.)

In reply, on May 22, 2006, GCL's counsel sent OMWD a letter, stating: "[GCL] is in receipt of your letter dated April 21, 2006 confirming that Paragraph 8 of the [Agreement] executed with [OMWD] on March 15, 2006 expressly conditions the delivery of recycled water to the [GCL] landfill upon completion and certification of an [EIR] prepared by [DEH] that analyzes all environmental impacts of the project, including those associated with the use of recycled water.

"[GCL] acknowledges and agrees that *Paragraph 8 requires the completion and certification of an [EIR] by DEH that analyzes all environmental impacts of the project, including those associated with the use of recycled water. . . .*" (Italics added.)

Assuming arguendo the trial court properly considered those letters in interpreting the Agreement, neither letter supports an interpretation of the Agreement that *OMWD* (as a responsible agency) retained its full discretion under CEQA, after considering a final EIR certified by DEH regarding the

Landfill project, to approve or disapprove the activities provided for in the Agreement or to require mitigation measures regarding or alternatives to those activities. Rather, section 8 of the Agreement, even as subsequently clarified by the parties' letters, merely acknowledges that *DEH* (as the lead agency) is in the process of preparing a final EIR that will address the environmental impacts of the Landfill project, including GCL's use of recycled water obtained from OMWD, and that *GCL* is responsible for complying with CEQA (e.g., those requirements set forth in the final EIR certified by DEH). The Agreement omits any reference to *OMWD's* duties, as a responsible agency regarding the Landfill project, to comply with CEQA (i.e., by considering the final EIR certified by DEH *before approving* and committing itself to the water delivery and construction activities provided for in the Agreement). Therefore, neither the February 17, 2006, approval of the Agreement by OMWD's board, nor OMWD's execution of the Agreement as of March 15, 2006, conditioned OMWD's performance of the Agreement on OMWD's subsequent exercise of its CEQA discretion to take other actions under CEQA after considering the final EIR certified by DEH.[8] Accordingly, contrary to OMWD's and GCL's arguments and the trial court's conclusion, OMWD's approval and signing of the Agreement *committed* OMWD to a *definite course of action* and did not condition OMWD's performance of the Agreement on its subsequent exercise of its CEQA discretion to take other actions after considering the final EIR certified by DEH.[9] (Cal. Code Regs., tit. 14, § 15352.)

Furthermore, even had the Agreement contained a condition pursuant to which OMWD retained its full discretion as a responsible agency under CEQA to consider a final EIR certified by DEH and to take other action, that condition alone would not necessarily have precluded OMWD's approval and execution of the Agreement from constituting an approval of the Landfill project. Rather, considering the circumstances surrounding OMWD's approval and execution of the Agreement in accordance with *Save Tara*'s general approach as discussed above, the minutes of OMWD's February 17, 2006, board meeting show the board did not acknowledge or otherwise recognize OMWD's duties as a responsible agency under CEQA before

---

[8] Likewise, assuming sections 7 and 8 of the Agreement conditioned OMWD's performance on GCL's (or OMWD's) receipt of all necessary permits, those conditions, contrary to the arguments of OMWD and GCL, do not show OMWD did not approve part of the Landfill project when its board approved the Agreement. (Cf. *Save Tara, supra,* 45 Cal.4th at pp. 139–142.) Those conditions in the Agreement did not preserve OMWD's full discretion under CEQA to subsequently approve or disapprove that part of the Landfill project or to require mitigation measures or alternatives.

[9] Contrary to OMWD's and GCL's arguments and the trial court's conclusion, we, like the court in *Save Tara*, conclude that *Stand Tall* and *McCloud* are inapposite and limited to their respective facts and, therefore, do not persuade us to reach a contrary conclusion. (*Save Tara, supra,* 45 Cal.4th at pp. 133–134.)

approving the Agreement. At most, the minutes reflect the conclusory statement *by GCL's counsel* that *GCL* "looked at the traffic impact through the 4S Ranch community and found that there are no significant environmental impacts." The minutes do *not* contain any reference to the Revised Draft EIR then being prepared by DEH, or to OMWD's duty under CEQA to consider the revised final EIR certified by DEH *before* approving the Agreement. Therefore, independently considering OMWD's approval and execution of the Agreement and the surrounding circumstances, we conclude "as a practical matter, [OMWD] has committed itself to the [Landfill] project as . . . to . . . particular features [i.e., its obligation to provide GCL with recycled water under the Agreement], so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara, supra*, 45 Cal.4th at p. 139.) In so doing, OMWD violated its CEQA duties as a responsible agency. "A responsible agency [e.g., OMWD] complies with CEQA by considering the [final] EIR or negative declaration prepared [and certified] by the lead agency [e.g., DEH] and by reaching its own conclusions on whether and how to approve the project involved." (Cal. Code Regs., tit. 14, § 15096, subd. (a).) Because OMWD did not comply with its CEQA duties before approving the Agreement, the Agreement must be set aside.

## VI

### *DEH as an Indispensable Party*

OMWD and GCL contend RiverWatch's petition must be dismissed because it did not name DEH as a necessary and indispensable party to the action.[10]

### A

Code of Civil Procedure section 389 provides in pertinent part: "(a) *A person* who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action *shall be joined as a party* in the action *if* (1) in his absence complete relief cannot be accorded among those already parties or (2) *he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest* or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. *If he has not been so joined, the court shall order that he be made a party.*

"(b) *If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity*

---

[10] The trial court did not decide this issue in denying RiverWatch's petition.

*and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable.* The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (Italics added.) Code of Civil Procedure section 389, subdivision (a), describes the circumstances under which the trial court may require a person to be joined as a party (necessary party). Code of Civil Procedure section 389, subdivision (b), provides that a trial court, in the exercise of its discretion, may additionally find that a necessary party is also an indispensable party but cannot be joined as a party, and therefore "in equity and good conscience" the action should be dismissed without prejudice. "A determination that the persons are necessary parties is the predicate for the determination whether they are indispensable parties." (*Deltakeeper v. Oakdale Irrigation Dist.* (2001) 94 Cal.App.4th 1092, 1100 [115 Cal.Rptr.2d 244].)

"Whether a party is necessary and/or indispensable is a matter of trial court discretion in which the court weighs 'factors of practical realities and other considerations.' [Citations.]" (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1529 [42 Cal.Rptr.3d 363].) "A court has the power to proceed with a case even if indispensable parties are not joined. Courts must be careful to avoid converting a discretionary power or rule of fairness into an arbitrary and burdensome requirement that may thwart rather than further justice. [Citation.] In the CEQA context, '[t]he public has a right to insist on the adequacy of the environmental document upon which the agency makes its decision,' and courts should avoid thwarting this purpose through the harsh application of indispensable party rules. [Citation.]" (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 26 [61 Cal.Rptr.3d 145].)

B

OMWD and GCL do not persuade us DEH was a *necessary* party to this action. DEH is the lead agency charged by CEQA to prepare and certify the EIR for the Landfill project. RiverWatch's instant petition, however, challenges only *OMWD's* failure to comply with CEQA before approving the Agreement. The petition does not, directly or indirectly, challenge DEH's actions in preparing the EIR for the Landfill project or otherwise allege DEH has not complied with its CEQA duties. Assuming arguendo that DEH could, or does, claim an interest relating to the subject of RiverWatch's action, DEH

is not so situated that the disposition of the action in its absence may, as a practical matter, impair or impede its ability to protect that interest. (Code Civ. Proc., § 389, subd. (a).) Were RiverWatch's petition granted, the relief ordered would affect the interests only of OMWD and GCL; it would not affect the interests of DEH. Alternatively stated, DEH does not have a direct interest in the result of this action or in a real party in interest (i.e., GCL). (Cf. *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 173 [234 Cal.Rptr. 357].) DEH does *not* have a *direct interest* in the availability of recycled water for the Landfill project; rather, it is GCL that has that direct interest. (*Ibid.*) Furthermore, it is *not* possible DEH could be subject to multiple, and potentially inconsistent, legal outcomes were it not joined as a party to this action. The relief requested by RiverWatch's petition will not affect DEH's duties under CEQA regarding the Landfill project and therefore could not cause it to become subject to potentially inconsistent legal outcomes were it not joined as a party.

Likewise, OMWD's arguments are unpersuasive. DEH was not required to be named as a party to the petition to set aside the Agreement pursuant to section 21167[11] or receive notice of that action pursuant to section 21167.5. Because RiverWatch's petition does *not* challenge any acts or decisions taken by DEH (e.g., the Revised Draft EIR prepared by DEH), neither section 21167 nor section 21167.5 applies. The cases cited by OMWD are inapposite and do not persuade us to conclude otherwise. (See, e.g., *Citizens Task Force on Sohio v. Board of Harbor Comrs.* (1979) 23 Cal.3d 812 [153 Cal.Rptr. 584, 591 P.2d 1236]; *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564 [106 Cal.Rptr.2d 14]; *Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864 [17 Cal.Rptr.3d 489].)

Furthermore, DEH is *not* an indispensable party to RiverWatch's petition challenging the Agreement because the interests or rights of DEH would *not* necessarily be affected by the relief requested by the petition. (Cf. *Tracy Press, Inc. v. Superior Court* (2008) 164 Cal.App.4th 1290, 1297–1302 [80 Cal.Rptr.3d 464].) Were the Agreement set aside as the petition requests, the

---

[11] Section 21167 provides: "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: [¶] (a) An action or proceeding alleging that a public agency is carrying out or has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project . . . ."

interests or rights of DEH will not necessarily be affected. Contrary to OMWD's argument, the requested relief will not effectively render DEH's EIR invalid.[12]

Accordingly, we conclude DEH was not a necessary party to RiverWatch's petition. (Code Civ. Proc., § 389, subd. (a).) In any event, assuming arguendo DEH was a necessary party to the petition, we nevertheless would conclude that in the circumstances of this case the trial court would have abused its discretion under Code of Civil Procedure section 389, subdivision (b), had it dismissed the petition for failure to join DEH as an indispensable party.[13] (Cf. *Deltakeeper v. Oakdale Irrigation Dist., supra*, 94 Cal.App.4th at pp. 1106–1109.)

VII

*Pending Request for Judicial Notice and Motion to Take*
*Additional Evidence*

On July 21, 2008, OMWD filed a request that we take judicial notice of the May 31, 2007, certification by DEH/County of San Diego Solid Waste Local Enforcement Agency of the revised final EIR for the Landfill project. On October 22, 2008, RiverWatch filed a motion requesting that we take additional evidence consisting of the July 2008 addendum to DEH's certified final EIR for the Landfill project and DEH's August 8, 2008, decision adopting that addendum. On December 3, 2008, OMWD filed a request that we take judicial notice of the trial court's November 20, 2008, minute order finding DEH complied with its CEQA obligations in certifying the revised final EIR for the Landfill project. We deny all three requests because those documents were not part of the administrative record in this case and are irrelevant to the substantive contentions on appeal. (Evid. Code, §§ 452, subd. (c), 459; Code Civ. Proc., § 909; *Western States Petroleum Assn. v.*

---

[12] To the extent OMWD hereafter complies with its CEQA duties as a responsible agency and approves a new recycled water supply agreement with GCL containing materially different terms from those in the Agreement (or if OMWD decides to not enter into any agreement with GCL), then DEH potentially may be required to, once again, partially revise its EIR for the Landfill project. (Cf. *Save Tara, supra*, 45 Cal.4th at p. 143.) However, that possibility does not make DEH an indispensable party to the instant petition. For example, if OMWD hereafter complies with its CEQA duties and nevertheless decides to approve a new agreement with GCL containing substantially the same terms as the Agreement, the fundamental facts underlying DEH's EIR will, in effect, remain unchanged. Therefore, DEH will not *necessarily* be affected by the relief requested by RiverWatch's petition.

[13] Because we decide this issue on other grounds, we do not address RiverWatch's assertion that section 21167.6.5 does not require DEH to be named as a party to the petition and therefore cannot be found to be a necessary or indispensable party under Code of Civil Procedure section 389.

*Superior Court, supra,* 9 Cal.4th at p. 573, fn. 4; *In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions that it enter a new judgment granting the petition for writ of mandate. The trial court shall issue a writ ordering OMWD to set aside its approval and execution of the Agreement and to reconsider those actions after consideration of a legally adequate EIR for the Landfill project. The court may also make any other order necessary and proper under section 21168.9. RiverWatch shall recover its costs on appeal.

Benke, Acting P. J., and Irion, J., concurred.

On January 30, 2009, the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied April 29, 2009, S171207.