Filed 4/27/16  Malibu Community Alliance v. City of Malibu CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MALIBU COMMUNITY ALLIANCE, et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF MALIBU, et al.,<br><br>    Respondents.<br><br>SANTA MONICA-MALIBU UNIFIED SCHOOL DISTRICT,<br><br>    Real Party in Interest. | B263666<br><br>(Los Angeles County<br>Super. Ct. Nos. BS138967,<br>BS137633) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr. Judge.  Affirmed.

Cox, Castle & Nicholson and Stanley W. Lamport for Plaintiffs and Appellants.

Jenkins & Hogin, Christi Hogin and Gregg W. Kettles for Respondents.

Orbach Huff Suarez & Henderson and Stan M. Barankiewicz for Real Party in Interest.

_____

The Santa Monica-Malibu Unified School District filed an application for development permits allowing the installation of athletic field lights at a Malibu high school. The City of Malibu's local ordinances authorized the city planning commission to make an initial determination whether to issue the permits, with a right of appeal to the city council. During the planning commission hearing, the Malibu city attorney announced the commission lacked a quorum to decide the matter because several commission members had disqualifying conflicts of interest. The District's application was subsequently heard and decided by the city council, which approved the permits.

Appellants filed a petition for an administrative writ of mandate ordering the city to revoke the permits. Appellants argued that: (1) the city council had violated local ordinances by granting the District's permit application before the planning commission had issued a decision on the matter; (2) one of the planning commissioners who had recused himself from participating in the hearing on the District's application had failed to provide a sufficient basis for his disqualification; and (3) under the California Environmental Quality Act, the city was required to conduct a supplemental environmental study addressing whether the proposed field lights would have a significant environmental effect when considered in conjunction with a separate District project pending before the city. The trial court denied the petition. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Santa Monica-Malibu School District's Environmental Review of Proposed Improvements to the Malibu Middle and High School Campus*

#### 1. *Review of the District's original Malibu campus construction plan*

Pursuant to its obligations under the California Environmental Quality Act (Pub. Resources Code, § 21000 et. seq.)[1] (CEQA), the Santa Monica-Malibu Unified School District conducted an initial study to determine whether proposed renovations to the Malibu middle and high school campus (the MMHS campus project) would have a

---

[1]     Unless otherwise noted, all further statutory citations are to the Public Resources Code.

significant impact on the environment. (See Cal. Code Regs., tit. 14, § 15063 (CEQA Guidelines[2]) [public agency must conduct an initial study to determine whether a project will require the preparation of an environmental impact report].) In September of 2008, the District issued a "notice of preparation/initial study" (NOP/IS) concluding the project would require the preparation of an environmental impact report (EIR). (See CEQA Guidelines, § 15082 [agency must issue notice of preparation after it determines the project will require preparation of an EIR].) The NOP/IS identified numerous components of the proposed project, which included the installation of a permanent lighting system on the campus's primary athletic field and the construction of a lighted parking lot located adjacent to the field. The field lighting system was intended to replace temporary light stands the District had been using during evening and nighttime football competitions. The NOP/IS concluded that the lighting systems at the athletic field and the new parking lot "could adversely affect day or nighttime view in the area."

After issuing the NOP/IS, the District became aware that its ongoing use of temporary lighting at the MMHS athletic field violated a condition of the coastal development permit (CDP) it had obtained from the California Coastal Commission when building the campus in 1999 (the 1999 campus CDP).[3] The permit restriction,

---

[2] "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations. . . ." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)

[3] Under the provisions of the California Coastal Act (§ 30000 et seq.), a CDP is generally required for development within the coastal zone. (§ 30600, subd. (a).) The Act requires local governments within the coastal zone to prepare a local coastal program (LCP) for any portion of the coastal zone within their jurisdiction. (*City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 803-804 (*Half Moon Bay*); § 30500, subd. (a).) The LCP includes the local government's land use plans, zoning ordinances, zoning district maps, and other actions implementing the provisions and policies of the Coastal Act. (See § 30108.6.) The Coastal Act further requires the local government obtain the Coastal Commission's certification of the LCP. Prior to certification, the Coastal Commission retains authority to issue CDPs. However, once an LCP has been certified, the local government is delegated authority to issue CDPs. (See §§ 30519,

3

which precluded the use of lighting on the campus's athletic fields, was the result of a zoning restriction in the Malibu LCP that prohibited field lighting in parcels zoned for "institutional" use. To remedy this ongoing violation, the District decided to separate the field lighting project from the MMHS campus project, and conduct an independent environmental review of each project.

### 2. Environmental review and approval of the field lighting project

On May 8, 2009, the District issued a mitigated negative declaration (MND) assessing the environmental impacts of the field lighting project, which proposed the use of temporary lighting poles for a limited number of nights in September, October, November and December. (See CEQA Guidelines, § 15070, subd. (b) [describing MND process].) The analysis set forth in the MND assumed the lights would be used a maximum of 16 nights per year, for a total of 62 hours. The MND concluded that with certain revisions, the project would have no significant environmental impacts, rendering an EIR unnecessary.

After issuing the MND (see CEQA Guidelines, § 15073 [prior to adopting MND, agency must make the MND available for public comment]), the District received comments asserting that it had improperly "carve[d] out" the field lighting project from the MMHS campus project, and that the effects of the proposed field lighting should be addressed in the EIR the District was preparing for the MMHS campus project. In response to these comments, the District explained that the field lighting project was a "separate and distinct," "self-contained" project that "had no other components" beyond those set forth in the MND. (See Guidelines, § 15074, subd. (b) [agency must consider the comments it receives in determining whether to adopt a MND].) On July 1, 2009, the District adopted the MND and approved the field lighting project.

In August of 2009, the District submitted an application to the Coastal Commission requesting an amendment to the 1999 campus CDP that would allow

subd. (a), 30600, subd. (d); *Half Moon Bay, supra*, 106 Cal.App.4th at p. 804.) The Coastal Commission certified Malibu's LCP in 2002. (See generally *City of Malibu v. California Coastal Com*. (2012) 206 Cal.App.4th 549.)

4

lighting at the school's athletic fields. The Coastal Commission rejected the application, concluding the proposed amendment would violate the Malibu LCP's prohibition of lighting on athletic fields located in areas zoned for institutional use. Shortly thereafter, the city requested the Coastal Commission to certify an amendment to the LCP allowing "conditional use of lighting of the main sports field at public high schools within the institutional zone." (See § 30514, subd. (a) [local government may amend its certified LCP, but no such amendment may take effect "until it has been certified by the commission"].) The proposed amendment restricted when the lights could be used, and required that a conditional use permit be obtained before installing any such lighting.

Prior to the hearing on the amendment, the Coastal Commission issued a staff report analyzing the environmental impacts of the field lighting proposal. The Coastal Commission received numerous letters supporting and opposing the amendment. The "Malibu Dark Skies Committee" wrote a letter in opposition to the amendment asserting the District had "improperly segment[ed] review of the [MMHS campus project] from the nighttime lighting of the athletic field." The letter explained that the MMHS campus project included the "construction of a . . . parking lot directly adjacent to the athletic field, which would be used for sporting events and practices at the athletic field, thus the nighttime lighting of the athletic fields should be considered part of the same [MMHS campus project]." The letter contended that under CEQA, the District was prohibited "from subdividing a single project into smaller individual subprojects in order to avoid the responsibility of considering the environmental impact of the projects as a whole."

In response to these comments, the Coastal Commission prepared an addendum to its staff report explaining that it was not responsible for determining the "adequacy of the [District's] CEQA process," and that the analysis set forth in its staff report provided sufficient "information about the impact from the [athletic field] lighting . . . to assess [the proposed amendment's] consistency with the [Malibu LCP]."

On October 11, 2011, the Coastal Commission approved the amendment to the LCP, subject to the following modifications: (1) the lights could not be used between June 1 and August 31; (2) the lights could only be used on three nights in any single

5

week; (3) the lights had to be turned off by 7:30 p.m., but could remain on until 10:30 p.m. up to 18 nights per year. After the city accepted the proposed modifications, the Coastal Commission certified the LCP amendment and amended the 1999 campus CDP to permit lighting on the campus athletic fields.

In April of 2012, the District prepared an addendum to the 2009 MND analyzing changes that had been made to the field lighting project based on the restrictions set forth in the LCP amendment.[4] The addendum concluded the project revisions would not create any environmental impacts that had not been assessed in the original MND. On April 19, 2012, the District voted to adopt the MND addendum and approve the field lighting project. One week later, the District issued a notice of determination announcing its approval of the project.

### 3. Environmental review of the MMHS campus project

While seeking the Coastal Commission's authorization to utilize field lighting, the District had been simultaneously preparing an EIR for the MMHS campus project. In July of 2011, the District released a 3,000 page draft EIR (DEIR) for the project. The DEIR described various changes that had been made to the project since the publication of the 2009 NOP/IS, which included removing the field lighting component and expanding the size of the parking lot adjacent to the primary athletic field. The DEIR explained that the District had elected to treat the proposed field lighting as a separate project after discovering that the use of field lights would require changes to the city's LCP.

During the public review period, several commenters questioned the District's decision to separate the field lighting project from the MMHS campus project. A letter

---

**4** The primary changes to the project included: (1) installing four 70 foot permanent lighting poles, rather than five 53 foot temporary light poles; (2) increasing the maximum annual usage of the lights from 62 hours to 125 hours; (3) allowing the lights to be used three nights a week between September 1st and May 31st, rather than up to 16 days between September 1st and December 31st; and (4) allowing the lights to be used until 10:30 p.m. up to 18 nights of the year.

from city resident Carol Gable asserted that "CEQA prohibits public agencies from subdividing a single project into smaller projects in order to avoid the responsibility of considering the environmental impact of the project as a whole. . . . This DEIR does not analyze the cumulative impacts of the proposed . . . parking lot along with the athletic field lighting and the significant and adverse effects both of those proposals will have on the environment." A letter from the Malibu Township Council similarly commented that the DEIR failed to consider the "cumulative impacts of night lighting on the proposed new . . . parking lot in conjunction with the impact of . . . permanent night lighting of the athletic field."

In February of 2012, the District issued its final EIR (FEIR) regarding the MMHS campus project, which included a new section addressing potential cumulative impacts from the field lighting project. The FEIR concluded that even if the field lights were utilized for the maximum amount of time allowed under the LCP amendment, there would be no significant, cumulative aesthetic impacts on nighttime views. The FEIR also responded to comments asserting the field lighting project should have been included as a component of the MMHS campus project, explaining that the District had properly considered the field lighting as a standalone project for which an MND had already been approved. On February 8, 2012, the District issued a notice of determination approving the FEIR.

### B. The City's Permit Approval for the Field Lighting Project

On March 15, 2012, the District filed an application with the City of Malibu requesting a CDP and a conditional use permit (CUP) for its field lighting project. Under the Malibu Municipal Code (MMC) and the "Local Implementation Plan of the City of Malibu Local Coastal Program" (MLIP), the city's planning commission was authorized to make the initial decision whether to issue the permits, with a right of de novo appeal to the city council. (See MMC § 17.66.060; MLIP §§ 13.7, subd. (B) & 13.20.) The planning commission scheduled a hearing on the District's application for June 5, 2012.

7

Prior to the hearing date, the planning commission issued a staff report recommending the permits be approved. The report contained a summary of the environmental review the District had conducted on the project, which included discussion of the 2009 MND, the 2012 addendum to the MND and MMHS campus project EIR. The report also discussed potential impacts the field lighting would have on public views, explaining that the Coastal Commission had previously found "the operation of the field lights . . . would be compatible with the character of the semi-rural area surrounding the MMHS campus and nearby public viewing areas," and "would not significantly impact public views of natural landforms, the beach and ocean, or the night time sky."

At the beginning of the June 5th hearing, planning commission chairman Roohi Stack announced the commission intended to remove the District's application from the agenda. City Attorney Gregg Kovacevich explained that the commission was "unable to produce an unconflicted, unbiased quorum" because three of its five members had disqualifying conflicts of interest. Kovacevich also described the nature of each conflict: "Commissioner [Jeffrey] Jennings lives within close proximity, and his participation is [therefore] precluded by the Political Reform Act. Commissioner [Roohi] Stack serves as Treasurer for the Shark Fund, which is the main fundraising body for Malibu High School, and she has made a $500 donation earmarked specifically in support of the lights. And Commissioner [Mike] Piersen has also made a donation of $500 to support the lights at Malibu High School. So for that reason the item is going to be moved directly to the city council for a hearing in the first instance [on June 25, 2012]." The commission then approved a motion to remove the item from the agenda.

On June 20, 2012, the planning commission prepared a memorandum regarding the commission's disqualification. The memorandum explained that the City Attorney had advised the commission that three of its members had conflicts of interest that precluded them from hearing the District's application, leaving the commission without a quorum. The memorandum also stated that chairman Stack and commissioner Piersen had each informed the Planning Director they had donated money to fund the proposed

8

project.  The Director informed the city attorney about the contributions, who then contacted the commissioners directly to discuss the matter further.

On June 25, 2012, the Malibu city council held a hearing on the District's application.  The city attorney announced that two council members had conflicts of interest and were therefore recusing themselves from participating in the decision.  The three remaining city council members heard public comment on the project.  Frank Angel, speaking on behalf of the Malibu Township Council, stated that the city council lacked authority to decide the permit application in the "first instance."  According to Angel, the local ordinances made clear that the planning commission had "original permit jurisdiction," and that the city council only had "appellate jurisdiction."  Angel asserted the city council had effectively "eliminated [p]lanning commission permit review," and requested that the council "refer [the matter] to the planning commission for its review first."  Angel also argued that planning commissioner Pierson had improperly recused himself because a "modest $500 donation . . . does not prove bias in favor of the project."

At the conclusion of the public comments, the city council voted three to zero to approve the District's application for a CDP and CUP.

### C.  The Petition for an Administrative Writ of Mandate

#### 1.  Summary of the writ petition

On August 24, 2012, appellants Malibu Community Alliance, Cami Winikoff and Stephen Uhring filed a petition for an administrative writ of mandate (see Code Civ. Proc., § 1094.5) ordering "the City of Malibu to vacate the City's [City Council's] approval of the [CDP and CUP] . . . permitting [the District] to install and operate . . . stadium lighting on the Malibu High School Campus."  The petition alleged two causes of action.  First, petitioners claimed the city council had violated local ordinances by granting the District's permit application before the planning commission had issued a decision on the matter.  According to petitioners, the MMC and MLIP provided the planning commission sole and exclusive authority to make the initial decision whether to approve the District's permit application, which the parties could then appeal to the city

9

council.  Petitioners further asserted that under the "rule of necessity," the planning commission was required to act on the application regardless of whether its members had conflicts of interest:  "Where, as in this case, a public body is required to take action on a matter but there is a lack of a quorum due to the recusal of members of the body, California law recognizes a 'rule of necessity,' which requires the body to select one of the members who have been recused to establish a quorum in order for the body to consider and take the actions the body is required to perform.  The City failed to apply the rule of necessity, and, as a result, the District's applications were [unlawfully] referred to the City Council without any hearing or recommendation by the . . . Planning Commission."

The petition further alleged that the planning commission's role in the application process served an important public interest by allowing "issues to be identified and addressed in a[n open] forum before the ultimate decision is made by the [city council]. . . .  The Planning Commission's focus is on matters of land use planning and entitlement, rather than the broad range of issues that must be considered by the City Council.  The City's Planning Commission mandate assures that the City Council receives the recommendation and input from a body with that singular focus."[5]

In its second cause of action, petitioners alleged the city had violated CEQA by failing to adequately review "the effects of installing and maintaining permanent high intensity lighting" at the athletic fields.  Citing Public Resources Code section 21166 and CEQA Guideline section 15162, petitioners contended there had been "changes in the circumstance under which the District's project would be undertaken that would involve major revision to the District's prior review as a result of new significant impacts and/or substantial increase in the severity of impacts previously identified. . . ."  The petition did

---

[5]     The petition also alleged the city council's decision to approve the District's application was unlawful because:  (1) the city council's findings were "not supported by substantial evidence in the record"; and (2) "the City failed to conduct a fair hearing before the city council."  Petitioners subsequently abandoned both of these claims.

10

not describe what change in circumstance had occurred, nor did it identify any new or substantially altered environmental impacts.[6]

## 2. *Application for preliminary injunction*

In October of 2012, petitioners filed an application for preliminary injunction to prohibit the installation of the athletic field lights. The court denied the application, concluding the petitioners had failed to establish a probability they would succeed in showing the city council had violated Malibu's local ordinances: "Petitioners' reliance on the distinction between original jurisdiction and appellate jurisdiction is misplaced. It is true that the mandatory language of the [MLIP] and MMC means that the Planning Commission must initially decide the permit application, if it can do so. . . . Although the initial determination rests with the Planning Commission, the City Council is vested with authority to hear appeals from the Planning Commission, and thus acts as the final authority. Petitioners do not explain how the Planning Commission is 'the only entity capable' of acting on the permits when Planning Commission decisions are appealed to the City Council, and the City Council's decisions supersedes that of the Planning Commission. [¶] The City Council holds a public hearing, develops an administrative record and decides the case de novo, which preserves the due process right of all concerned where there has been no Planning Commission hearing. As a result, the Planning Commission's proceedings become irrelevant. Thus, Petitioners are really complaining that there was no superseded hearing from which an appeal could take place. That cannot serve as a ground for probability of success."

---

[6] The petition's CEQA claim also alleged additional environmental review was necessary in light of "new information of substantial importance that was not previously known and that could not have been known . . . which demonstrates that the introduction of the lighting subject to the Permits would have significant, unmitigatable and adverse affects on public health." The petitioners have not pursued this portion of their CEQA claim on appeal.

### 3. Trial court ruling on the writ petition

On October 1, 2013, petitioners filed their memorandum of points and authorities in support of the petition for an administrative writ of mandate. Petitioners argued that under the local ordinances, "[t]he only way [an application for a CUP or CDP] can be decided by the city council is on appeal of a decision by the planning commission. [¶]. . . . Absent an appeal, the City Council ha[s] no authority . . . to issue [the permits]." Petitioners also reasserted that under the rule of necessity, the planning commission was required to render a decision regardless of whether it could provide an impartial forum because no other entity had authority to act.

Alternatively, petitioners argued for the first time that planning commissioner Mike Piersen's $500 contribution toward the lighting project was not a sufficient basis for recusal. Petitioners explained that if Piersen had not improperly recused himself, the planning commission would have had a quorum (three members) to decide the application. According to petitioners, the commission's decision to "disqualify [Piersen] for unfounded reasons" constituted an abdication of the duties that had been delegated to it under the local ordinances.

The petitioners' memorandum also argued the city had violated CEQA by relying on the 2009 MND and the 2012 MND addendum that the District had previously prepared for the field lighting project. Petitioners contended that after the District approved the 2012 addendum, there had been a "substantial change in circumstances" regarding the project that required the city to conduct its own environmental review of the project. According to petitioners, this "change in circumstances" had occurred when the District filed an application seeking permits for the MMHS campus project while its application for the field lighting permits was simultaneously pending before the city. Petitioners argued that because both applications were pending before the city at the same time, the city was precluded from "rely[ing] on an MND that only evaluated the [athletic field lighting] as a standalone project." Petitioners further explained that although the field lighting project and MMHS campus project "started as separate projects at the District, . . . they became one project . . . when the two applications [for permit approval]

12

were both pending at the city. That change in circumstances mandated further CEQA environmental review."

After holding a hearing, the court denied the writ petition. Consistent with the prior order denying the District's application for a preliminary injunction (issued by a different trial court judge), the court ruled that Malibu's local ordinances did not preclude the city council from acting on a permit application when the planning commission was unable to provide an impartial forum. The court explained that petitioners' "argument turn[ed] on its contention that the Planning Commission was the only body that was legally 'capable' of acting, in the first instance, on the . . . District's application. . . . [Under] their reading of the applicable municipal code provisions the City Council was only authorized to hear appeals from the Planning Commission. . . ." The court found this "interpretation of the applicable ordinances unreasonable and illogical," concluding that although the city had authorized the planning commission to hear permit applications, "an implied term of that delegation is that, if the planning commission is legally unable to perform a planning function, the city reserves to itself the power to take jurisdiction and to perform that function."

The court also rejected the petitioners' reliance on the rule of necessity, explaining: "No reported decision has applied the rule of necessity to require an intermediate body such [as] a planning agency commission to act so that its decision may be appealed to a final decision maker such as a city council. . . . The rule of necessity is not needed to decide this issue because the Malibu City Council is legally capable of deciding the . . . District application if the [p]lanning commission is legally prevented from doing so." The court noted that under petitioners' theory, the planning commission would be required to hold a "useless, indeed farcical hearing and conduct a vote that everyone would understand was only for the purpose of permitting an appeal to the final decision maker. The rule of necessity does not exist to require a sham proceeding before a body that is not the final decision maker. The law does not require an idle act."

The court also rejected petitioners' claim that planning commissioner Piersen had improperly recused himself from participating in the District's permit application. The

court found that a "reasonable observer would . . . conclude [c]ommissioner Pierson could not be a 'reasonably impartial, noninvolved' reviewer for the [field lighting project]" because his $500 donation amounted to "a public declaration of his support for the . . . project."

Finally, the court ruled petitioners had failed to establish any change in the circumstances of the project that compelled the city to conduct further environmental study. The court explained that the mere fact the "District's applications for [the MMHS campus project and field lighting project] were pending before the City at the same time, so that the City could have considered the environmental impact of the parking lot lights at the same time it considered that of the field lights," did not qualify as a change in circumstance. The court noted that when the District released its MND in 2009 and its DEIR of MMHS campus project in April of 2011, several commenters had asserted the District should have considered the field lighting project in conjunction with the MMHS construction project. According to the court, these comments illustrated that the issue petitioners were now raising was not a "change" in the circumstances of either project.

## DISCUSSION

### A. *The Malibu City Council Had Authority to Decide the District's Permit Application*

#### 1. *Summary of local ordinances*

Chapter 17.66 of the Malibu Municipal Code (MMC) sets forth the local procedures for obtaining a CUP. Section 17.66.060, subdivision (C) states that "conditional use permits shall be decided by the planning commission." [7] The commission is required to hold a public hearing on each CUP application, and record its decisions in writing. (MMC, § 17.66.080.) The MMC lists numerous findings the

---

[7]    Section 17.66.060 differentiates between "[m]inor conditional use permits," which may be decided by the director of the planning commission, and "[m]ajor conditional use permits," which "shall be decided" by the planning commission. The parties do not dispute that the permit the District's sought in this case qualified as a "major" CUP.

14

commission must make before approving a CUP, and authorizes the commission to impose conditions on the "the requested use." (MMC, § 17.66.090.)

Section 17.04.220 sets forth appellate procedures, providing that any person "aggrieved" by a decision "made by the planning commission . . . in connection with . . . a . . . [CUP] may appeal such action to the city council." (MMC, §17.04.220, subd. (A).) The ordinance lists various procedural requirements necessary to perfect an appeal, describing the type of form appellants must use, the time limits for initiating an appeal and the required filing fees. (MMC, §17.04.220(B) & (C).) Section 17.04.220, subdivision (B) clarifies that "[o]nly matters raised in the appeal shall be subject to review. . . . Although the issues on appeal will be limited by the appeal, the appellate body will accept new evidence (de novo appeal) and will not be bound by the previous record." Section 17.04.220, subdivision (C) further provides that the appeal is to be processed and noticed in the same manner as the original application.

Malibu's local implementation plan contains similar provisions regarding CDP applications. Section 13.7 of the MLIP states that "coastal development permits shall be decided upon by the Planning Commission subject to appeal provisions in Section 13.20 of the [MLIP] (Appeals)." The MLIP requires that every decision on a CDP include "written findings" addressing whether certain factual requirements have been satisfied. (MLIP, § 13.9.) Section 13.20.1 states that "[a]ny decision made by the Planning Commission may be appealed by an aggrieved person to the City Council"; alternatively, the city council is permitted to initiate an appeal "upon the affirmative vote of a majority of its members." (MLIP, § 13.20.1, subds. (A), (F).) Section 13.20.1, subdivisions (B) and (C) set forth procedural requirements regarding appeals, including the forms that must be used, time limits for filing an appeal and filing fees. The section also states that the appeals are to be "processed and noticed in the same manner as the original coastal development permit application." (MLIP, § 13.20.1 (B).)

15

*2. Malibu's local ordinances do not preclude the city council from deciding a permit application when the planning commission is disqualified from acting on the matter*

Petitioners contend that, under the MMC and MLIP, the city council was precluded from hearing the District's application until the planning commission had issued a decision on the matter. Citing the rule of necessity, petitioners argue that because the local ordinances provide the planning commission sole and exclusive authority to make the initial decision on permit applications, it is required to act even when it has declared itself unable to provide an impartial forum.

Before addressing the merits of petitioners' argument, we note that their briefing fails to articulate any prejudice they suffered from the city council's allegedly unlawful actions. (See generally *County of Los Angeles v. Williamsburg National Ins. Co.* (2015) 235 Cal.App.4th 944, 955 ["The appellant generally has the burden to demonstrate prejudicial error"].) Petitioners acknowledge that, given the city council's authority to "hear appeals [of permit decisions] de novo," the planning commission's initial decision effectively operates as a nonbinding "recommendation." Thus, even if the planning commission had elected to proceed on the District's application despite its declared lack of partiality, the District (or any other aggrieved party) would have been permitted to seek a de novo hearing before the city council. Petitioners have not alleged (or provided any evidence suggesting) that the city council would have reached a different decision on the District's application had the planning commission heard the matter first.[8]

However, even if we assume petitioners have demonstrated prejudicial harm, or that their claims are not subject to harmless error analysis (see, e.g., *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 ["harmless-error analysis" inapplicable "in a narrow category

[8] Petitioners' complaint does allege that the planning commission's decision allows the city council to receive "input" from an administrative agency that specializes "in matters of land use planning and entitlement." However, the administrative record demonstrates that although the planning commission did not vote on the District's application, it did provide the city council a detailed staff report recommending that the project be approved. It is unclear what "expertise" the planning commission might have provided to the city council beyond that set forth in its staff report.

16

of circumstances" which includes "acts in excess of jurisdiction"]), we conclude the city council was permitted to act on the District's application under the unique circumstances presented here. "The construction of a municipal ordinance . . . is governed by the rules governing construction of statutes." (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647.) "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 898-899.) "Although a court may not insert qualifying provisions into a statute not intended by the Legislature and may not rewrite a statute to conform to an assumed legislative intent not apparent [citation], 'words of general import may be given a contracted meaning dependent upon the connection in which they are employed, and considering the general purpose or scheme entertained by the legislature in passing the statute, and . . . words will not be given their literal meaning when to do so would evidently carry the operation of the enactment far beyond the legislative intent and thereby make its provisions apply to transactions never contemplated by the legislative body. . . .' [Citations.]" (*Bruce v. Gregory* (1967) 65 Cal.2d 666, 674.)

As summarized above, the MMC and MLIP authorize the planning commission to hear and decide permit applications. The commission's decisions may then be appealed by any "aggrieved party" to the city council. The ordinances are silent, however, as to what should occur when the planning commission has declared itself incapable of providing an unbiased forum. There is no language authorizing or requiring the planning commission to act on a permit application when it is unable to comply with due process requirements (see *Cooper v. State Bd. of Medical Examiners* (1950) 35 Cal.2d 242, 245 ["'Due process requires a fair [hearing] before an impartial tribunal'"]), nor is there any language that specifically authorizes the city council to act in place of the commission under such circumstances. Petitioners contend that if the drafters of the local ordinances

17

had intended the city council to hear permit applications when the planning commission cannot provide an impartial forum, they would have included an exception that expressly permitted the council to do so. The city disagrees, contending the ordinances should be construed as providing the city council authority to act on a permit application when the planning commission is disqualified. According to the city, this authority is implied from the city council's power to conduct a de novo review of any planning commission decisions that are appealed to it.

The city's interpretation is the more reasonable reading of the statutory scheme, avoiding anomalous and illogical consequences that would result from petitioner's proposed interpretation. (See *Dyna–Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 ["Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation"]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1221 ["Whenever possible, courts must construe statutes [in a matter that] avoid[s] absurd or anomalous results"]; *Watts v. Oak Shores Community Assn.* (2015) 235 Cal.App.4th 466, 476 ["The 'golden rule' for statutory interpretation is that where several alternative interpretations exist, the one that appears the most reasonable prevails"].) Although referred to as an "appeal," the city council's de novo review of planning commission permit decisions essentially operates as an original proceeding: The city council is not required to give any deference to the planning commission's factual or legal findings; it is not bound by the record before the planning commission; and it is permitted to hear new evidence. (See *Collier & Wallis v. Astor* (1937) 9 Cal.2d 202, 204 [under statute directing administrative agency to decide matter "subject to appeal within ten days to the superior court where the same shall be heard de novo," the "court hears the matter, not as an appellate court, but as a court of original jurisdiction, with full power to hear and determine it as if it had never been before the [agency]"; "A hearing de novo . . . is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held. It differs, therefore, from an ordinary appeal from an inferior to an appellate body where the proceedings of the hearing in the inferior court are reviewed and their

18

validity determined by the reviewing court.  A hearing de novo therefore . . . completely nullifies the former determination of the matter"].)  Given the city council's authority to hold a de novo hearing, it would be illogical to require the planning commission to act when it has declared itself unable to comply with fair hearing requirements.  (See generally *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1448 ["The right to a fair procedure includes the right to impartial adjudicators"].)  We can conceive of no legislative purpose—and petitioners have identified none—that would be served by requiring a biased and conflicted administrative agency to issue a decision that would then be subject to de novo review at the city council.

The petitioners' proposed interpretation is not aided by the common law "rule of necessity," which allows an otherwise disqualified administrative body to proceed if it "is the only entity able to act in the matter, . . . [and]if disqualification would absolutely prevent a determination of the proceeding."  (2 Cal.Jur.3d (2007) Administrative Law, § 56; see *Nider v. Homan* (1939) 32 Cal.App.2d 11, 17 (*Nider*) ["'an officer exercising judicial functions may act in a proceeding wherein he is disqualified by interest, relationship, or the like, if his jurisdiction is exclusive . . . so that his refusal to act would prevent absolutely a determination of the proceeding.'"]; *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1112 ["Under [rule of necessity], 'where an administrative body has a duty to act, and is the only entity capable of acting, the fact that the body may have an interest in the result does not disqualify it from acting'"].)  The rule is intended to "prevent the vital processes of government from being halted or impeded by officials who have conflicts of interest in the matters before them." (*Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 520.)  In light of the city council's de novo authority to review and decide permit applications, we fail to see how the planning commission's disqualification "would prevent absolutely a determination of the proceeding" (*Nider, supra,* 32 Cal.App.2d at p. 17) or "make it impossible for the [the city] to fulfill one of its vital public duties." (*Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 581 [rule of necessity "allows public officials to take actions they would otherwise be disqualified from taking by operation of conflict of

19

interest rules if their disqualification would make it impossible for the public agency to fulfill one of its vital public duties"].)  The rule of necessity would only apply if the drafters of the local ordinances intended to prohibit the city council from acting on a permit application when the planning commission was disqualified from doing so.  For the reasons explained above, we do not believe that was the drafters' intent.  We see no reason to apply a common law rule of last resort that essentially excuses a due process violation where, as here, a separate entity has been authorized to decide the matter.

We also reject petitioners' assertion that this case is indistinguishable from several prior decisions in which a city council was found to have violated local ordinances by overturning a planning commission's permit decision.  None of the cases petitioners cite addressed a situation in which the planning commission was disqualified from acting on the matter; rather, in each case, the city council's actions were found unlawful because it lacked authority to review the decision at issue.

For example, in *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66 (*Johnston*), [overruled in part by *Bailey v. Los Angeles* (1956) 46 Cal.2d 132, 139] the Marin County planning commission denied a conditional use permit that would have allowed the construction of a fish cannery.  The Marin County Board of Supervisors overturned the commission's decision and granted the permit.  Plaintiff sought an injunction restraining the board from issuing the permit, arguing that Marin County's local ordinances did not authorize the board to overturn the planning commission's denial of a CUP.  The Supreme Court agreed, concluding that the local ordinances only gave "[t]he board of supervisors . . . power . . . to approve or refuse to approve the decision of the commission approving the application for a permit; the board of supervisors is given no authority over the application should the commission deny it. . . .  [I]t follows that the board of supervisors was not authorized by the ordinance to take affirmative action on the application for a use permit in the face of the disapproval thereof by the planning commission." (*Id.* at p. 73.)  The court rejected the board's assertion that it had "inherent power to grant a use permit regardless of the terms of the ordinance," explaining:  "When a board of supervisors acts in an administrative capacity, as in granting permits under a

20

zoning ordinance, it is bound by the terms of the ordinance until the ordinance is amended through proper legislative procedure. [Citations.]" (*Id*. at p. 74.)

In *Highland Development Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 169 (*Highland Development*), [disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11] the city's board of public works issued Highland Development Company a permit to construct a driveway over a city street. A community association requested that the city council revoke the permit due to potential safety issues. Although the city attorney advised the council it had no jurisdiction to review the board of public works' permit decisions, the city council voted to revoke the permit, asserting it had a "duty" to remedy the board's "dangerous decision" regardless of any "'literal interpretation of [the city] [c]ode.'" (*Id*. at p. 175.) The appellate court, however, found that the city's charter and ordinances gave the board of public works exclusive "authority to grant or deny a permit of the type involved in th[e] case," and that "no provision of law authorize[d] the council to act as an appellate body reviewing and overruling the [b]oard's issuance of such a permit." (*Id.* at p. 181.) As in *Johnston, supra,* 31 Cal.2d 66, the court rejected the city's assertion that its actions were justified as an exercise of its broad authority over city matters: "[The city council's] plenary power has already been exercised, in the case of driveway permits, by [assigning the board the power to issue driveway permits]. Having thereby entrusted the function of granting such permits to the Board, the city council is not free to deviate from this legislative scheme. . . . To allow otherwise would make a travesty of the rule that governmental entities must abide by the law." (*Id*. at p. 183.)

Finally, in *Woody's Group, Inc. v. City of Newport Beach* (2015) 233 Cal.App.4th 1012 (*Woody's*), the Newport Beach planning commission granted a permit authorizing a restaurant to extend its weekend operating hours and permit dancing at its establishment. City council member Mike Henn issued a notice of appeal asserting the permit was incompatible with the city's general plan. (*Id*. at p. 1017.) At the city council hearing, Woody's attorney argued Henn had no authority to initiate the appeal because he did not qualify as an "interested party" within the meaning of the municipal code, and had failed

to comply with the procedural requirements necessary to perfect an appeal to the city council. The city council voted three to two to reverse the planning decision, with Henn casting the deciding vote. In an accompanying resolution, the council explained that although Henn did not qualify as an "interested party," his appeal was nonetheless proper based on the city council's "long-standing," unwritten "policy" permitting council members to initiate appeals, and to do so without complying with any of the procedures required of other appellants. (*Id*. at p. 1019.)

The appellate court reversed, concluding that the local code contained no provision that allowed "appeals by city council members," or that exempted city council members from the procedural prerequisites necessary to file an appeal. (*Woody's, supra,* 233 Cal.App.4th at p. 1019.) The court further explained that the city council was not permitted to rely on "unwritten rules, policies or customs outside the municipal code. . . ." (*Id*. at p. 1027) The court emphasized that the impropriety of the city council's conduct was "amplified" by Henn's participation in the hearing. The court noted that Henn's notice of appeal contained language showing "he was strongly opposed to the planning commission's decision on Woody's application." (*Id*. at pp. 1022-1023.) Moreover, during the city council hearing, Henn read a prepared statement in support of his vote to overturn the permit, and then personally called a motion to reverse the planning commission's decision. According to the court, Henn's actions demonstrated "'an unacceptable probability of actual bias.'" (*Id*. at p. 1022.)

Thus, in each of the cases on which petitioners rely, a city council acted to overturn the decision of its local planning commission in situations where the local ordinances provided it no authority to review the matter. In this case, the Malibu city council did not act to overturn a decision of the planning commission, nor is there any suggestion that the city council's actions were the result of bias or partiality. Rather, the city council concluded that in light of its express authority to conduct a de novo review of the planning commission's permit decisions, it had implied power to act on a permit application when the planning commission was disqualified from doing so.

22

### B. Petitioners Have Failed to Establish Commissioner Pierson Was Prohibited from Recusing Himself

Petitioners also challenge planning commissioner Mike Piersen's decision to recuse himself from voting on the District's application. Prior to the planning commission hearing, Piersen informed the commission's director he had contributed $500 toward the field lighting project. After speaking with the city attorney about the matter, Piersen elected to disqualify himself. Petitioners assert that Piersen's $500 contribution was not a sufficient basis for recusal. They further contend that his improper recusal resulted in a lack of quorum, thereby precluding the planning commission from carrying out the duties delegated to it under the local ordinances.

The only legal authority petitioners cite in support of their claim consists of cases that address when a public official is required to recuse himself from the decisionmaking process. (See *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470 (*Nasha*) [addressing claim that agency decision "should be set aside" based on the failure of a biased decision maker to recuse himself]; *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1234, 1236 (*BreakZone*) [addressing claim that council member's participation in hearing violated appellant's "right to a fair hearing"]; *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219 [addressing claim that public official's failure to recuse himself violated "procedural due process rights"]; *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1172-1173 [assessing claim that conflicted council member's participation deprived plaintiff of a "fair hearing"].) More specifically, each of the cited cases addresses a due process claim asserting that a public official's failure to disqualify himself violated the plaintiff's "fundamental right to a fair hearing." (*BreakZone, supra,* 81 Cal.App.4th at p. 1234.) These cases set forth the general framework used to assess due process claims predicated on the participation of an allegedly biased decision maker: "Procedural due process in the administrative setting requires that the hearing be conducted ""*before a reasonably impartial, noninvolved reviewer.*"" [Citation.] [¶] . . . [¶] [I]in order to prevail on a claim of bias violating fair hearing requirements, [the plaintiff] must establish "'an unacceptable probability of

23

actual bias on the part of those who have actual decisionmaking power over their claims."' [Citation.] (*Nasha, supra,*125 Cal.App.4th at p. 483.)

Here, however, petitioners are not claiming the city violated their due process rights by allowing a biased public official to participate in the decisionmaking process, but assert instead that a person who supported the project they oppose was required to participate. In effect, they argue their legal rights were violated because a commissioner who had contributed money to the project under review elected to recuse himself from the decisionmaking process. It is a fundamental rule of appellate review that the appellant "affirmatively . . . show error and . . . show further that the error is prejudicial." (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; *Scheenstra v. California Dairies, Inc*. (2013) 213 Cal.App.4th 370, 403). It is not our role to "construct a [legal] theory" that will support petitioners' arguments. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Petitioners have presented no case law or other legal authority indicating that an administrative official, acting on the advice of counsel, is barred from recusing himself when he believes a prior financial contribution created a disqualifying conflict of interest. Even if petitioners are correct that Piersen was not legally required to disqualify himself (a question we need not decide), that does not establish he acted unlawfully by choosing to do so. Moreover, petitioners have not articulated how they were prejudiced by the recusal of a public official who had provided financial support for the very project they oppose.[9]

### C. *The City Was Not Required to Prepare a Subsequent Environmental Study*

Petitioners argue the city violated its obligations under CEQA when it refused to prepare a supplemental environmental study analyzing the impacts of the District's field

---

[9] Petitioners have requested that we take judicial notice of statements commissioner Piersen made at a planning commission hearing held several months after this appeal was initiated. We find it unnecessary to consider Piersen's comments, which are not relevant to our analysis or our disposition of the issue. The request for judicial notice is therefore denied. (See *Stop the Casino 101 Coalition v. Brown* (2014) 230 Cal.App.4th 280, 291 fn. 10 [denying request for judicial notice where materials were "irrelevant or unnecessary to resolution of the issues on appeal"].)

24

lighting project in conjunction with the MMHS campus project, which proposed the construction of a new parking lot adjacent to the field with a separate lighting system. Although the District previously prepared and approved a MND and MND addendum for the field lighting project, petitioners contend there were subsequent changes to the circumstances under which the project was undertaken that required the city to conduct further environmental review.

### 1. Summary of relevant CEQA provisions

Under CEQA, public agencies are generally required to conduct an initial study to determine whether a project may have a significant effect on the environment. See *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1372 (*Gentry*).) If the agency concludes the project will not have a significant effect on the environment, or that any such effects will be mitigated by modifications to the originally proposed project, it may adopt a negative declaration or mitigation negative declaration (ND/MND). (*Ibid.*) If, however, the agency determines the proposed project may have a significant effect on the environment, it must prepare and certify an EIR. (*Ibid.*)

Before an agency adopts a ND/MND or certifies an EIR, it must make the document available for public review and comment. When proceeding by way of a ND/MND, the agency must "consider the comments it receives in determining whether to adopt [the environmental study]. [Citation.]" (*Gentry, supra,* 36 Cal.App.4th at p. 1372.) When an EIR is required, the lead agency initially prepares a draft EIR that is then released to the public for comment. The agency must then prepare and certify a "final EIR" that responds to comments "relating to significant environmental issues. [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123-1124 (*Laurel Heights*).)

When an agency approves a project on the basis of a ND/MND or an EIR, it must file a "notice of determination" (NOD) announcing it has adopted the environmental study and approved the project. (See §§ 21108, subd. (a), 21152, subd. (a); CEQA Guidelines, §§ 15075, subd. (a), 15094, subd. (a).) The filing and posting of the NOD

25

commences a 30-day statute of limitations for a legal challenge to the agency's approval of a project under CEQA. (§ 21167, subds.(b), (c); CEQA Guidelines, §§ 15075, subd. (e), 15094, subd. (f).)

For projects that are to be carried out or approved by more than one public agency, CEQA distinguishes between the "lead" agency and "responsible" agencies. CEQA "defines a lead agency as 'the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment.' [Citation.]" (*Planning and Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 905 [citing and quoting § 21067].) By contrast, "'[r]esponsible agencies are agencies, other than the lead agency, that have some discretionary authority for carrying out or approving a project. [Citation.]'" (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1201 (*RiverWatch*).)

CEQA requires that the lead agency "prepar[e] an EIR or negative declaration for the project." (CEQA Guidelines, § 15050, subd. (a).) The responsible agency must then "consider the lead agency's EIR or negative declaration prior to acting upon or approving the project." (CEQA Guidelines, § 15050, subd. (b).) Subject to certain limitations, once the lead agency has approved a final EIR or negative declaration, responsible agencies are "'ordinarily . . . not allowed to prepare a separate EIR or negative declaration. [Citations.]'" (*RiverWatch, supra*, 170 Cal.App.4th at p. 1201; see also § 21166; CEQA Guidelines, § 15231.)

One exception to that general rule is set forth in Public Resources Code section 21166 and CEQA Guidelines section 15162: "(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent [environmental study] shall be prepared for that project unless the lead agency determines . . . one or more of the following: [¶] . . . [¶] (2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or (3) New information . . . which was not known and could not have been known with

26

the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows [the project will have substantial effects not discussed in the previous study, or that there are feasible mitigation measures not addressed in the previous study]." (CEQA Guidelines, § 15162.[10]) Section 15162, subdivision (c) clarifies that if any of the conditions described in subdivision (a) occurs after the lead agency has approved the project, "a subsequent EIR or negative declaration shall only be prepared by the public agency which grants the next discretionary approval for the project, if any." Section 15052 similarly provides that when a "responsible agency is called on to grant an approval for a project subject to CEQA for which another public agency was the appropriate lead agency, the responsible agency shall assume the role of the lead agency when [¶] . . . [¶]: The lead agency prepared environmental documents for the project, but the following conditions occur: (A) A subsequent EIR is required pursuant to Section 15162; (B) The lead agency has granted a final approval for the project, and (C) The statute of limitations for challenging the lead agency's action under CEQA has expired."

In sum, CEQA and its implementing guidelines require the lead agency to prepare a ND/MND or EIR and make the document available for public review. Any challenge to the environmental study must be brought within 30 days after the lead agency files a notice of determination approving the project. Once the lead agency has certified an EIR or adopted a ND/MND, the responsible agency is normally required to rely on that study. (*Riverwatch, supra*, 170 Cal.App.4th at p. 1201; see also § 21166; CEQA Guidelines, § 15231.) Neither the lead agency nor the responsible agency may prepare a subsequent

---

**10** Public Resources Code section 21166 only references preparation of an EIR, stating that "when an environmental impact report has been prepared . . . , no subsequent or supplemental [EIR] shall be required by the lead agency or by any responsible agency" unless one of the certain statutorily prescribed circumstances occurs. "Guidelines, section 15162 [citation] provides a similar limitation on subsequent environmental review following an agency's adoption of a negative declaration. Guidelines section 15162 has been held to be a valid regulation that implements the principles contained in section 21166. [Citation.]" (*Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 653.)

27

EIR or ND/MND unless:  (1) there is a substantial change with respect to the circumstances under which the project was undertaken that involves new (or substantially increased) significant environment impacts; or (2) new information that could not have been reasonably known at the time the previous EIR or negative declaration was completed shows the project will have significant effects not discussed in the previous study.  If either of those events occur after the statute of limitations for challenging the lead agency's actions have passed, the responsible agency authorized to grant the next discretionary approval must conduct the subsequent environmental study.

## 2. *Standard of review*

"'[J]udicial review under CEQA is generally limited to whether the agency has abused its discretion by not proceeding as required by law or by making a determination not supported by substantial evidence.' [Citation.]  The 'whole record' is available to a reviewing court in determining whether there is substantial evidence.  [Citations.]  Where an action is brought . . . to challenge an agency's factfinding determinations, 'the court shall not exercise its independent judgment.' [Citation.]  The '"reviewing court must resolve reasonable doubts in favor of the administrative finding and decision."' [Citation.]" (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1793 (*ALARM*).)  "A decision not to require a subsequent or supplemental EIR is [likewise] reviewed under an abuse of discretion standard of review.  '[W]hen a court reviews an agency decision under [Public Resources Code section 21166 and CEQA Guidelines section 15162] not to require a subsequent or supplemental EIR on a project, the traditional, deferential substantial evidence test applies.  The court decides only whether the administrative record as a whole demonstrates substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications to the EIR.' [Citation.]" (*Ibid*. [italics omitted].)

28

*3. Petitioners have failed to identify any substantial change in circumstance that required the city to conduct a subsequent environmental study*

Petitioners do not dispute the District was the lead agency on the field lighting project, and that the city was a responsible agency. Nor do they dispute that, as a responsible agency, the city would ordinarily be required to rely on the 2009 MND and 2012 addendum that the District had previously adopted in relation to the project. Petitioners contend, however, that after the District approved the MND and the addendum, there was a substantial change in circumstances that required the city to prepare a subsequent environmental study under Public Resources Code section 21166 and CEQA Guidelines section 15162. Petitioners argue this change in circumstance occurred when the District filed an application seeking approval of the MMHS campus project while its application for the field lighting project was still pending before the city. According to petitioners, once the District decided to seek approval for both projects at the same time, the city was compelled to conduct a separate supplemental environmental study assessing "the relationship between the operation of the [field l]ights and the . . . adjacent parking lot light[s]" that were part of the MMHS campus project.

Section 21166's limitations on when an agency can be compelled to prepare a subsequent or supplemental environmental study is "intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved.' [Citation.]" (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1057.) Section 21166 and its implementing regulation, Guideline section 15162, only allow "a subsequent or supplemental EIR or negative declaration . . . to explore environmental impacts not considered in the original environmental document. [Citation.] '"[Section] 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired [citation], and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process. [Citation.]"' The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis. Only changed circumstances,

29

and any additional environmental impacts they cause, are at issue." (*Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288, 1296.)

In this case, the question whether the environmental effects of the field lighting project should have been considered in conjunction with the effects of the MMHS campus project was not a new issue or circumstance that arose only after the District sought the city's approval of those two projects. The record demonstrates instead that when the District released its MND for the field lighting project in 2009, it received multiple comments asserting that: (1) the project should be treated as a component of the MMHS campus project, rather than as a standalone project; and (2) the environmental impact of the field lights should be evaluated in conjunction with the impacts of the parking lot that was proposed as part of the MMHS campus project. Prior to approving the MND, the District provided responses to those comments.

The District received virtually identical comments after releasing its draft EIR for the MMHS campus project. Multiple commenters asserted the EIR should have assessed the impacts of the field lighting in conjunction with the proposed lighting system in the new parking lot. In the final EIR, issued in February of 2012, the District provided responses to these comments and added a new section assessing the cumulative impacts of the field lighting project. [11]

Two months after releasing the FEIR for the MMHS campus project, the District issued its addendum to the MND for the field lighting project. On April 24, 2012, the District issued an NOD announcing it had adopted the MND addendum and approved the field lighting project, thereby triggering "a 30-day statute of limitations on . . . challenges to the approval under CEQA." (CEQA Guidelines, § 15075, subd. (g).)

---

[11] These same issues were also raised during the Coastal Commission's review of the city's request to certify an amendment to the LCP allowing field lighting at public schools located within parcels zoned for institutional use. In August of 2011, the Coastal Commission received a letter in opposition to the amendment asserting that the District should have included the field lighting project as a component of the MMHS campus project. According to the letter, the District had "improperly segmented" the field lighting project from the MMHS campus project, thereby violating its obligation to "consider[] the environmental impact of the projects as a whole."

The administrative record demonstrates that during the environmental review of both projects, multiple parties raised the exact issue petitioners assert here: that the environmental impacts of the field lighting project should have been considered in conjunction with the impacts of the MMHS campus project, which proposed the construction of a new parking lot near the athletic field with a separate lighting system. If petitioners believed the District's original MND or the 2012 addendum did not adequately address the potential combined impacts of the MMHS campus project, their remedy was to challenge the District's approval of the field lighting project within 30 days after the District issued its notice of determination. (See § 21167.) Having failed to do so, petitioners are now barred from pursing what amounts to a collateral attack on the District's environmental review under the guise of "changed circumstances." (See generally *ALARM, supra,* 12 Cal.App.4th at pp. 1794-1795 [rejecting petitioner's "assertion that a subsequent or supplemental EIR is required" as a "disguised challenge to the EIR's original . . . analysis"].)

In sum, throughout the three-year environmental review process, the District made clear it was treating the proposed field lighting and the proposed renovations to the MMHS campus as separate projects for the purposes of its CEQA review. The mere fact that the District sought city approval for the MMHS campus project while its application for the field lighting project was simultaneously pending before the city does not constitute a "substantial change . . . with respect to the circumstance under which" the field lighting project was undertaken. The city therefore had no duty under CEQA to conduct any further environmental study.

## DISPOSITION

The judgment denying the petition for writ of administrative mandate is affirmed. Respondents and the real party in interest shall recover their costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

BLUMENFELD, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.